TIGHTS, INC., Plaintiff,

v.

KAYSER–ROTH CORPORATION,
Defendant.

Civ. A. No. C–179–G–70.

United States District Court,
M. D. North Carolina,
Greensboro Division.

June 21, 1977.

Jack W. Floyd of Smith, Moore, Smith, Schell & Hunter, Greensboro, N.C., for plaintiff.

Paul B. Bell of Bell, Seltzer, Park & Gibson, Charlotte, N.C. and Bernard Ouziel of Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for defendant.

## MEMORANDUM OPINION

BALDWIN, Judge, Sitting by Designation.

This case first came on for trial before a jury on October 25, 1974, on the issues of validity and infringement of the Rice patent No. RE 25,360. The issue of infringement was not submitted to the jury because the parties made a pretrial stipulation of defendants' infringement. However, the validity issue was tried to the jury. A special verdict was rendered by the jury, and, in accordance therewith, the Court entered judgment of validity of the Rice patent. Defendants appealed to the United States Court of Appeals for the Fourth Circuit. Upon review, the Fourth Circuit affirmed the judgment below, *Tights, Inc. v. Acme-McCrary Corp. et al.,* 541 F.2d 1047 (4th Cir. 1976). Defendants Acme-McCrary Corporation and Adams-Millis Corporation ceased to participate in the litigation at this point. Defendant, Kayser-Roth Corporation, petitioned to the United States Supreme Court for a writ of certiorari. The petition was denied on November 29, 1976.

Judgment was reserved as to the amount of damages to be assessed against defendant Kayser-Roth for production of U-shaped seam pantyhose which infringed the Rice patent. On November 17, 1976, the parties stipulated that defendant produced 23,021,181 dozen pantyhose which infringed the Rice patent.

The matter currently before the Court relates to the royalty rate to be applied as a measure of damages. No evidentiary hearing on this matter was held because the parties stipulated on February 1, 1977 that there was sufficient evidence in the record before the court to establish the appropriate measure of damages.

The parties are in essential agreement as to the following facts. Plaintiff [1] had acquired a licensing program from its predecessor Morpul which program plaintiff expanded in 1968 and continued until the patent expired in 1975. The licenses in the record, between the plaintiff and manufacturers in the hosiery industry for rights under the Rice patent, vary from a purported royalty rate of $0.50 [2] in 1959 to $0.02, exclusive of the "paid up" licenses which were granted.[3] Plaintiff's licensing program for the Rice patent indicates that in 1968 the royalty rate stabilized at $0.02.

The factual issues in this case are:

---

1. The Rice patent was owned serially by Tight-pat, Inc., Morpul, Inc., and Tights, Inc., none of which were manufacturers.

2. All royalties will be expressed per dozen garments.

3. A paid up license involves a fixed payment not dependent on production.

(I) When was the first $0.02 license granted? What were the circumstances under which this $0.02 license was granted?

(II) Did the infringement of the Rice patent in the hosiery industry affect the royalty rate for licensing of the Rice patent?

(III) If the $0.02 royalty rate was artificially set by the pressures of infringement, then what would have been the reasonable royalty for licensing the Rice patent?

### FINDINGS OF FACT

#### I.

With regard to the first fact question, this Court finds that the first $0.02 license was granted to defendant as a result of a settlement agreement. On October 14, 1968, plaintiff filed a law suit against defendant alleging breach of a 1963 license ($0.25) of the Rice patent. The parties settled on October 16, 1968. The terms of the proposed settlement, *inter alia*, terminated a 1963 license between the plaintiff and defendant, and substituted a $0.02 license. The royalty rate under the old license was $0.25. The settlement agreement setting up the license at the rate of $0.02 was to be effective August 1, 1968. Defendant alleges that the first $0.02 license developed in the licensing of Hanes Corporation. The record shows that on October 1, 1968 Hanes Corporation entered a $0.05 license agreement with plaintiff. It was through the terms of an assignment dated November 1, 1968 between plaintiff and Hanes Corporation that the effective royalty rate for licensing the Rice patent to Hanes was reduced to $0.02. Clearly, the $0.02 settlement with Kayser-Roth was prior to the Hanes $0.02 arrangement.

The Court further finds that infringement did exist before plaintiff negotiated for the $0.02 royalty rate for the Rice patent. Evidence of infringement and of unreported but licensed production prior to setting $0.02 as a royalty rate includes:

(1) Tightpat, Inc., predecessor to Tight, Inc., entered an agreement on September 28, 1959, settling a patent interference proceeding with defendant. The agreement acknowledged infringement by Burlington Industries. The royalty rate set in this agreement for licensing the Rice patent was $0.50 although defendant, by the terms of the agreement, was not to pay the full royalty.

(2) Indian Head Hosiery Company, a division of Indian Head, began unlicensed production of an infringing U-shaped seam pantyhose in early 1968. The evidence of record reveals, at this point in time, that there was an outstanding license setting a $0.25 royalty rate with defendant.

(3) Defendant, although licensed under the 1963 license ($0.25), produced 120,000 dozen of infringing U-shaped seam pantyhose prior to August 1, 1968, without reporting such production to the plaintiff.

(4) In answer to Interrogatories filed in this case, on November 27, 1970, defendant stated that between August 1, 1968 and August 1, 1970 (the complaint in this case being filed August 20, 1970) "virtually everyone in the hosiery industry was infringing." Defendant named fourteen companies which had produced an infringing U-shaped seam pantyhose but had not paid royalties under the Rice patent.

To summarize, there is evidence of record that infringement was occurring as early as 1959 by Burlington Industries. By early 1968, evidence shows that, at least, Indian Head Hosiery was infringing and defendant was breaching his license by failing to report production. In answer to Interrogatories filed in this case, defendant stated that it was aware of other companies who were infringing the Rice patent.

From this evidence of admitted and alleged infringement and unreported, licensed production, this Court finds that infringing and license breaching activity occurred in the hosiery industry prior to 1968, and continued after the first $0.02 license was negotiated. On November 17, 1976, the parties to this action filed a stipulation that defendant infringed the Rice patent by producing 23,021,181 dozen U-shaped seam pantyhose between August 1970 and March 1975.

## II.

This Court next considers whether the infringing activity artificially lowered the royalty rate.

The plaintiff's (and its predecessors') licensing program for the Rice patent is marked by several turning points. The Court chooses 1959 as a starting point for review. In that year, Tightpat, Inc. agreed with defendant and its wholly owned subsidiary, Alamance Industries, Inc., to license the Rice patent, nominally at a $0.50 royalty rate. On August 1, 1963, defendant entered a nonexclusive license at a royalty rate of $0.25 with Morpul, Inc., predecessor to Tights, Inc. Hudson Hosiery entered a licensing agreement including a royalty rate of $0.05 with plaintiff on August 30, 1968. Negotiations with Hanes Corporation were also finalized on October 1, 1968 in a license at a royalty rate of $0.05. Finally, on October 16, 1968, pursuant to a law suit settlement defendant agreed to take a license under the Rice patent for a $0.02 royalty rate. From then until October 24, 1974, the trial date in this case, plaintiff entered, at least, thirty-eight license agreements at a $0.02 royalty rate. The court notes that the patent grant expired March 18, 1975.

To summarize, between August 1, 1968 and October 16, 1968, the royalty rate decreased from $0.25 to a negotiated rate of $0.02. This Court finds that the $0.05 licenses with Hudson Hosiery and Hanes Corporation were negotiated by the plaintiff in the face of infringement occurring within the industry. Further, the first $0.02 license was negotiated on October 16, 1968 as a result of settlement of a suit against defendant involving the Rice patent. Subsequently, in rapid succession, the $0.05 licenses to Hudson Hosiery and Hanes Corporation were renegotiated to a $0.02 royalty rate. From this time until the patent expired, the record shows that approximately forty-five licenses having a $0.02 royalty rate were granted. Members of the hosiery industry were interested in the Rice patent. Plaintiff was a fledgling corporation (founded in 1967) and was anxious to license the Rice patent. This Court finds that the infringing activities within the hosiery industry prior to August 1968 influenced the market for the Rice patent. The result was an artificial depression of the royalty rate to $0.05 and then to $0.02. The Court further concludes that granting the first $0.02 license effectively limited future licensing negotiations to a $0.02 royalty rate. The continuation of the infringing activities between 1970 and 1975 by defendant indicates a disregard of the Rice patent within the industry. Factors of competition and economics placed plaintiff in an intractable position and forced upon plaintiff the depressed royalty rate. This Court finds that neither royalty rate of $0.05 or $0.02 represents a "reasonable rate" which the statute, 35 U.S.C. § 284, sets as a minimum standard for damages flowing from infringement of a valid patent.

## III.

To determine the amount of a reasonable royalty for use of the Rice patent, the Court must inquire into those factors that will enable it to determine the amount that a licensor (such as Tights, Inc.) and a licensee (such as Kayser-Roth Corporation) would have agreed upon, at the time the infringement began, if both had been reasonably and voluntarily trying to reach an agreement. *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y.1970), modified, 446 F.2d 295 (2d Cir.), *cert. denied*, 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971). A number of factors generally relevant to this "willing licensee/willing licensor" inquiry are listed in the *Georgia-Pacific* case, and some of these factors are particularly relevant and are considered by the Court here.

The Court finds that the defendant generally considered the garment covered by the Rice patent to have significant value. During 1958 and 1959, defendant caused an interference proceeding to be precipitated against the patent in the United States Patent Office, and thereafter settled this proceeding by entering a "$0.50" license agreement in 1959. However, the stated

royalty in this agreement was effectively reduced by collateral agreements. Further, after cancelling the $0.02 license agreement (1968) on August 1, 1970, Kayser-Roth infringed the patent for nearly five years (from August 1, 1970 until the patent's expiration in March of 1975), to the extent of 23,021,181 dozen garments, despite notice of infringement, ongoing litigation, and the prospect of substantial litigation costs and potentially significant liability. These acts, as well as the other facts in this case, are cogent evidence that Kayser-Roth attached significant value to the teachings of the patent.

Although plaintiff has addressed interrogatories to the point, the Court does not have before it any evidence of the rates paid by Kayser-Roth Corporation for the use of other patents comparable to the patent in suit. However, the "$0.50" and $0.25 license agreements entered by Kayser-Roth are convincing evidence of what the defendant thought to be the value of the Rice patent. These licenses were not for a "comparable" patent, but were under the Rice patent itself. The Court finds this evidence more reliable for what the parties would consider the worth of the invention than any evidence of royalties paid on comparable patents. Kayser-Roth in the 1963 agreement was committed to pay royalties on pantyhose containing a small crotch piece or gusset, as well as on the U-shaped seam pantyhose. The Court finds that if defendant chose to use the crotch piece design, defendant was depriving itself of substantial cost savings associated with the elimination of the crotch piece, and even so negotiated and was willing to pay $0.25 per dozen. As an indicator of what a willing licensee and willing licensor would have agreed to as a royalty rate, in good faith bargaining, without the depressing influence of open infringement, the Court considers defendant's agreements to pay $0.25 per dozen highly persuasive and pertinent.

The commercial success of U-shaped seam pantyhose, as judged by the numbers of manufacturers engaged in producing the product, was considerable. Counting both licensees and identified infringers, some eighty-five manufacturers were practicing the invention. Kayser-Roth's production alone was 35,000 dozen per week in 1970 and over 23 million dozen during the period of infringement (August 1, 1970 to March 18, 1975) and is further evidence of the commercial success of the patented product.

The basic advantage of the patented U-shaped seam garment over nonpatented pantyhose containing a crotch piece or gusset was the elimination of the crotch piece or gusset from the product and the attendant reduction in sewing time. As of 1967, pantyhose had substantially replaced ladies' seamless nylon hosiery on the American market. Prior to the beginning of infringement of the Rice patent in 1968, pantyhose on the market contained a crotch piece or panel. It is evident from the very volume of U-shaped seam production by Kayser-Roth, and the number of manufacturers utilizing the Rice invention, that both the U-shaped seam and crotch piece pantyhose were basically interchangeable; the Rice U-shaped seam garment was just as good as pantyhose produced with a crotch piece. *Tights, Inc. v. Acme-McCrary Corp.,* 541 F.2d 1047, 1056 (4th Cir. 1976). The Court finds, therefore, that to a prospective licensee, the primary measure of the benefit attending use of the Rice patent, over the manufacture of noninfringing crotch piece pantyhose, would be the cost reduction associated with the elimination of the crotch piece. Indeed, after *Morpul, Inc. v. Glen-Raven Knitting, Inc.,* 238 F.Supp. 520 (M.D. N.C.1965), aff'd, 357 F.2d 732 (4th Cir. 1966), the cost saving was the only inducement a potential licensee had to use the Rice invention since the noninfringing crotch piece pantyhose was available to him without charge. The Court therefore finds cost savings to be a highly reliable and significant factor in determining what a willing licensee would agree to pay a willing licensor for use of the Rice invention.

The invention patented by Rice resulted in highly significant reductions in the production costs of pantyhose. Kayser-Roth's president, Mr. Alfred Slaner, testified that use of the U-shaped seam resulted in sav-

ings of between $0.12 and $0.24 per dozen. Other specific evidence shows savings to Kayser-Roth were even higher than that. There is evidence on different styles of garments produced under the Rice patent that savings were as much as $0.36, $0.48, $0.46 and $0.26 per dozen. One document in evidence shows a cost reduction, by utilization of the U-shaped seam, of $0.97 per dozen. Testimony by the former defendants confirms these high cost savings. The president of Acme-McCrary Corporation testified that the savings by elimination of the crotch piece were between $0.20 to $0.25 per dozen. The comptroller of Adams-Millis Corporation testified to cost savings in the range of $0.25 to $0.30 per dozen. The president of that company characterized any cost reduction in the manufacture of pantyhose of $0.20 per dozen or more as a "major cost reduction." The Court finds from the foregoing evidence that the cost reduction which could reasonably be anticipated by Kayser-Roth Corporation from production of Rice U-shaped seam pantyhose was between $0.25 per dozen and $0.50 per dozen. Applied to Kayser-Roth's stipulated infringing production of 23,021,181 dozen, this would have resulted in a cost reduction in the production of U-shaped seam pantyhose of from $5.7 to $11.4 million. The Court finds that such a reduction in production costs would be of major interest and benefit to a manufacturer such as Kayser-Roth, and would have been a highly significant factor in any good faith bargaining and negotiation for a license under the patent. The Court finds that $0.37 per dozen reasonably reflects this cost saving. Numbers involving fractions of cents are rounded off downward to express their value conservatively and to maintain uniform precision.

The Court finds, in the context of this case, that the patentee would have been reasonably entitled to receive from 25% to 50% of the cost saving as reasonable royalties. This Court finds that 25% of the cost saving is a reasonable entitlement where the parties anticipate that the licensee will have to make substantial contributions to practical commercialization. This Court finds that 50% of the cost saving is a reasonable entitlement where the parties anticipate that the licensee will have to make only routine creative contributions toward commercialization.

The Court finds that 33% of the cost saving reasonably reflects the patentee's entitlement in view of the following factors. The Rice invention is simple and of widespread consumer utility. As of August 1, 1970 (the beginning of defendant's infringement for this cause of action and the date at which reasonable royalties are to be calculated), the production methods and market were fully developed and commercial success established. Thus, the creative contribution required of a licensee was minimal. The defendant derived substantial cost saving in choosing the Rice invention over other available products. Finally, the patent must be viewed as if recognized to be valid and infringed. These factors provide some persuasive evidence for an even division (50%) of the cost saving between the parties but this Court finds that a conservative value of 33% is supported by clear and definite proof.

The Court finds that a reasonable royalty based on cost savings which the parties could reasonably anticipate is $0.12 per dozen (33% of $0.37). The Court further finds this to be a reasonable and conservative value under all the evidence in this case.

Looking at the history of negotiations between Tights, Inc. and Kayser-Roth in the period prior to industry-wide infringement of the Rice patent, this Court finds that the parties actually agreed to a royalty rate which was at least $0.12 per dozen. In the license of September 28, 1959, the parties agreed to an effective royalty of $0.25 less a rebate of 10% of royalty payments for parties licensed by the patentee. This Court finds that the parties negotiated with the expectation that the rebate would reduce the effective royalty to a value less than $0.25 per dozen. Based on the uncertain future of the invention at that time and, therefore, uncertainty as to the degree that rebates would affect Kayser-Roth's royalty payments, it is unreasonable to as-

sume that the parties anticipated that the effective royalty would fall below $0.12.

The license of August 1, 1963 involved a stated royalty of $0.25, but the license included terms in settlement of the 1959 license which terms cause the effective royalty rate to be less than $0.25. This Court finds that the testimony of the parties involved in the 1959 and 1963 licenses indicate that a royalty rate of at least $0.12 was believed to be reasonable by the parties. The *Glen Raven* case, supra, in 1966, which limited the scope of the Rice patent to pantyhose without gussets, did not substantially affect the reasonableness of $0.12. The 1963 license expressly recognized the possibility that the scope of the patent was limited. Furthermore, it is clear that the 1963 license was primarily directed toward the garment without the gusset, not only because the terms of the document focus on the garment with the gusset, but also because elimination of the gusset results in a substantially equivalent garment at a substantially lower cost, so Kayser-Roth would presumably choose to eliminate the gusset.

This Court finds that the $0.02 license between Tights, Inc. (plaintiff) and Kayser-Roth (defendant) was agreed upon by Tights, Inc. in order to avoid the costs and uncertainties of litigation. In essence, the $0.02 rate reflects Tights, Inc.'s estimate of a reasonable royalty less the substantial costs of litigation necessary to demand that reasonable royalty. It is unreasonable to allow Kayser-Roth to precipitate this litigation by terminating the license and then to accept Kayser-Roth's argument that a royalty ($0.02), which was a compromise to avoid litigation, is the proper and reasonable royalty.

Accordingly, the Court fixes the damages under the first paragraph of 35 U.S.C. § 284 at $0.12.

From the foregoing Findings of Fact, the court makes the following Conclusions of Law.

## CONCLUSIONS OF LAW

1. Plaintiff is entitled to damages adequate to compensate for defendant's infringement, and the damages should not be less than a reasonable royalty. 35 U.S.C. § 284.

2. Since plaintiff is not in the business of directly using the invention claimed in the Rice patent but rather is in the business of licensing the patent, plaintiff's damages should be based on a reasonable royalty. *Trio Process Corp. v. L. Goldstein's Sons, Inc.*, 533 F.2d 126, 129 (3d Cir. 1976).

3. A royalty of $0.02 per dozen is the standard royalty in this case, but because it was established in an atmosphere of industry-wide infringement of and disrespect for the Rice patent, $0.02 may be less than a reasonable royalty. *Trio Process*, supra, 533 F.2d at 129.

4. A reasonable royalty must be determined as if it resulted from hypothetical negotiations at the time defendant began infringing, namely, August 1, 1970. *Georgia-Pacific*, supra, 446 F.2d at 296. At that time, the commercial potential of the product was fully recognized and developed.

5. In determining a reasonable royalty, it is improper to give substantial evidentiary weight to existing license agreements having a royalty rate which was arrived at under conditions of open, industry-wide infringement and lack of respect for the patent. This is true even if application of the reasonable royalty thus determined would not allow defendant a reasonable profit from the infringing activity. A patentee who has attempted to avoid costly and time-consuming litigation by settling for less than a reasonable royalty should not be penalized when an infringer forces full litigation. A rule to the contrary would allow the giants of a given industry to use threats of costly and protracted litigation to extort an unreasonably low royalty from an impecunious patentee and then to force the patentee into the litigation while maintaining the hedge that the unreasonably low royalty rate would put a ceiling on damages. In a case in which the patentee wished to rely on royal-

ty values deriving from settlement of an infringement suit with a *third party*, the Supreme Court found that such values do not reflect the proper measure of damages for infringement because such values may be strongly influenced by a desire to avoid full litigation. *Rude v. Westcott*, 130 U.S. 152, 164, 9 S.Ct. 463, 32 L.Ed. 888 (1888).

■ 6. Looking at all the facts existing on August 1, 1970, except the existence of the standard royalty of $0.02, and assuming industry-wide respect for the Rice patent, this Court holds that $0.12 per dozen is a reasonable royalty.

7. Applying the damage rate of $0.12 per dozen to the production data as set forth and stipulated to by the parties, the Court fixes the base damage award at $2,762,541.72.

■ 8. The Court fixes the pre-judgment interest rate at 6% simple interest as of the end of each month during which infringing garments were produced and sold by the defendant, as stipulated by the parties. This Court holds that application of interest from the time of infringement is appropriate in this case because the defendant terminated an existing license and began infringing with full knowledge of the existence, history, and apparent scope of the patent. Particularly under these conditions, plaintiff is entitled to be placed in the position that he would have been in if defendant had paid the reasonable royalty at the time that defendant unlawfully used plaintiff's invention. Otherwise, plaintiff would not receive "damages adequate to compensate for the infringement" as required by 35 U.S.C. § 284.

9. The Court retains this cause for further orders relative to the question of whether the damages herein should be increased under 35 U.S.C. § 284, upon the question of whether attorneys fees should be awarded to the plaintiff under 35 U.S.C. § 285, and upon the issues raised in count 2 of plaintiff's complaint against the defendant Kayser-Roth Corporation, its Answer and Counterclaims.

It is so ORDERED.